## Case No. 7,087.

### The ISAAC ALLERTON.

[See Case No. 7,088.]

## Case No. 7,088.

### The ISAAC ALLERTON.

ALDERSLADE et al. v. The ISAAC AL-
LERTON.

[5 Adm. Rec. 612.]

District Court, S. D. Florida. Dec. 23, 1856.

Winer Bethel, for libelants.
Wm. R. Nackley, for respondent.

MARVIN, District Judge. This is a suit brought by George Alderslade and 433 others to recover salvage for their services in saving portions of the materials and cargo of the ship Isaac Allerton [Baldwin, master], sunk about fifteen miles from this port. The ship was laden with a valuable cargo, consisting of dry goods, groceries, hardware, and a variety of other articles, intended for the Western trade, and was bound from New York to New Orleans. During the night of the 27th of August, while on her voyage, she encountered a hurricane, which drove her onto the reef, where she rolled and thumped very heavily for several hours, the sea breaking over her. The ship's company were in great danger of loss of life, by the ship's breaking up and going to pieces. The master cut away the masts, and the ship drove over the reef, and sunk in five fathoms of water, the master and crew escaping in their boats, as she was going down. They got safely to the shore, and were picked up, the next day, by the wrecking schooner Florida. The wreck was soon visited by nearly or quite all the wrecking vessels and boats on the coast, and the labor of saving the cargo was commenced and carried on by several parties or sets of salvors, each party for itself. The ship lay about five fathoms under water, a little careened, her upper deck being five and eight feet under water. A diver went down and fastened a hook in a plank found started in the deck, and, a purchase being rigged to the mast of a large wrecking vessel, the plank was torn off. Other planks were removed from time to time in like manner, and the light let into the hold, which greatly facilitated the operations of the divers. The goods between decks being saved, and a considerable portion in the lower hold, the planks of the lower deck were somewhat loosened by the explosion of a quantity of gunpowder, and then torn off by purchases. As the deck planks were in this manner removed, the salvors saved as much of the goods as they could by "fishing" or by striking an iron piece, fastened to the end of a long staff. into the boxes and packages, and drawing them to the surface. This mode of saving them met with partial success at first, but as the water deepened it became much more uncertain. Besides, the packages were often jammed and fastened together, so that they could not be detached and recovered in this manner, and diving for each separate package became the means of saving the principal part of the cargo. The divers had no submarine armor or diving bell or other artificial apparatus, but each diver plunged into the hold, having one end of a small line around his waist, the other being held by another diver stationed in a boat. and ready to follow and extricate him in case he should get entangled. When at the bottom the diver fastened a pair of iron hooks or clamps with a rope attached to the box or bale, by means of which it was raised. The salvors were, by no means, all divers. The diving was principally done by some fifteen or twenty persons. Diving in deep water produces a headache; blood frequently runs from the ears and nose. It cannot be continued for several hours, much less days, without in-

tervals of rest. It is attended, too, with considerable danger to life and health, though in the present case no lives were lost, and no very serious accident occurred, except that one man's face got badly cut and injured while diving. The persons who did not dive waited upon the divers, and received and took care of the goods. The labors of the several parties of salvors, or of some of them, were continued, from time to time, through a period of two months, and the total value of the cargo and materials saved by them is $96,309.72.

In relation to the question of the amount of salvage that ought to be allowed the salvors, it may be remarked that the principal circumstances of the case are extraordinary, no instance ever having occurred before upon this coast of saving so large an amount of property by diving, or of saving any amount by diving in so deep water. Small quantities of goods have often been saved by diving into the holds of wrecked ships in eight and ten feet of water, and the court has allowed fifty, sixty and seventy-five per cent. of the value, according to the circumstances,—vide The Cimbus [Case No. 2,718]; The Van Bree [unreported]; and The Telamon [Case No. 13,820],—and in one case, —Lowe v. Some Linens [unreported],—saved by diving into the hold of an abandoned ship on the coast of Yucatan, ninety per cent. was allowed; but in this case no claimant appeared, and it was not supposed any ever would appear, and it is neither precedent nor authority for any other case than one like it, any more than the case of The William Hamilton, 3 Hagg. Adm. 168, in which the English court of admiralty gave the whole of the proceeds of a sale of a derelict, £35, to the salvors, no claimant appearing, is a precedent for a case where a claimant may fairly be expected to appear, or when the amount saved is greater. The case which most resembles the one now under consideration, which I have found anywhere reported, is the case of The Thetis, 3 Hagg. Adm. 14, and an appeal, 2 Knapp, 390. The British frigate Thetis, having on board $810,000 in bullion. belonging to British merchants, struck upon a rock on the coast of Brazil, and drove into a cove about 450 feet wide, surrounded on three sides by nearly perpendicular cliffs of rocks, 150 and 200 feet high, where she sunk, and where the sea in bad weather, or with a southerly wind, would rush in with great force, causing a fearful whirlpool. The hull went to pieces. leaving the treasure upon the bottom, in five and six fathoms of water. The salvors, consisting of the admiral on the Brazil station and the captains and crews of the sloops of war Lightning, the War Spike, the Algerine, and the tender Adelaide. engaged in the enterprise of saving the treasure. They constructed diving bells from the water tanks of their ships. using, in one instance, a fire engine for an air pump, erected a derrick 158 feet in length, constructed of twenty-two separate pieces of spars, stepped in the rocks near the water's edge, and secured by a chain cable to the tops of the cliffs, by which they worked the bells for some time with great success. The sea afterwards broke away the derrick. They then extended suspension cables from cliff to cliff, by which they worked the larger bells. The smaller one they worked from their launches. The bottom was carefully surveyed, and it was found, that the treasure was confined to a space of about thirty-one feet by forty-three, and covered over by heavy boulders of granite, the interstices between which were filled by guns and fragments of the wreck. This whole heap was completely cleared away to the bottom, and the rocks rolled one side. Numerous rocks were removed, varying in weight from five to sixty-three tons. Huts were constructed, and an encampment made for the accommodation of the men. Their services were continued for eighteen months. They suffered much in their health from fatigue and exposure. Four men were drowned. They saved in bullion $750,301, and in ordnance stores £1,206 10s. 8d. Expressing the total value in English money at £157,349 17s, the privy council, on appeal, allowed for salvage £29,000, or a little less than one-fifth of the gross value; charging the expenses, including £13,800 allowed the lords commissioners of the admiralty for the wages of the men, victuals, stores, and wear and tear of the vessels engaged in the service, and about £12,000 for other expenses to the residue, which left for the owners and underwriters a fraction less than two-thirds of the gross value of the treasure saved. This case is remarkable for the mechanical ingenuity displayed by the salvors, their perseverance under great difficulties, their protracted labors, and the very large amount of treasure saved. In the case under consideration, there was no resort to any mechanical inventions or instruments to save the property. The labors of the salvors were not so long protracted, nor the amount saved by them so great, as was saved in the Thetis. The number of salvors in both cases was probably nearly equal. Upon a full view of all the circumstances in the present case, I think, that the one-half of the net value of the property saved is a reasonable salvage, all expenses to be first deducted, and the balance equally divided between the owners and salvors. The amount of salvage, divided among the salvors in the ordinary manner, will make the men's shares about fifty dollars each; but divided. as it must be, in such a manner as to reward the divers with an extra allowance for their superior merit, it will enable the court to reward them handsomely, and pay the other salvors a fair compensation for their work and labor. It is a settled rule of decision in this court, from which it

rarely or never departs, that the amount of salvage, in a case where the vessel is lost, shall be less, although the property may be greater, than in a case where the vessel is saved, ceteris paribus; and in proportion somewhat to the promptness and skill with which a vessel is rescued from peril, is the reward to be increased. The reasons for this rule are obvious. When the vessel is lost, there is usually a great loss of property, and we are not to aggravate this loss by charging the little that may be saved with a greater salvage than the claims of simple justice may demand; and the claims of simple justice to the salvor do not ordinarily extend beyond a fair compensation pro opere et labore. All beyond this is a gratuity given or withheld by the courts upon grounds of public policy. When the vessel and a large amount of property have been lost, and a fragment only saved, there is but little and less means for giving such gratuities. Hand v. The Elvira [Case No. 6,015]. But when the vessel and entire cargo have been rescued from certain peril, a substantial service has been rendered to owners, by preventing a loss; they can afford a more liberal reward; and sound policy dictates such a reward, and the amount of property saved furnishes the means of making it. Hence both the interests of owners and wreckers correspond. This rule applies with more or less force to the case before the court.

It is necessary to advert to another feature in this case. I find that the marshal has returned in his account sales but few or no marks upon the boxes or packages. This omission is unusual. He explains it by saying that, when the sales first commenced, he found the marks much defaced, and in many instances difficult to ascertain, and after a time much of the goods were brought in and landed by the salvors in bulk and without any boxes; the boxes having been broken open in some instances by accident, and in others probably by design. Hence the numerous items of sales of "lots and parcels," without any marks. The loss of these marks is a serious misfortune to the owners of this cargo, as it forces upon them, of necessity and without their consent, a mode of settlement among themselves which may be very unjust, and very different in its result from what it would be if the marks had been preserved, so that the different shipments could be identified and their ownership ascertained. Now, it may be admitted that a large number of these marks were destroyed by the action of the water, yet I cannot but think that, had that care been exercised which the parties concerned were bound to exercise, many more of these marks would have been preserved, perhaps enough to adjust the loss by. The salvors were not justified in breaking open any of the boxes or packages except under circumstances of urgent necessity. They were bound to exercise the same care in saving the property and in preserving the marks which we may reasonably suppose they would wish others to exercise in regard to their property under like circumstances, and I cannot conceive any one of these salvors, if he understood his rights and his interests, would be satisfied to have his boxes broken open, or the marks in any manner defaced by a salvor, except under circumstances of urgent necessity. The Amethyst [Case No. 330]. I do not suppose that any of these boxes were broken open by the salvor with a fraudulent design. If so, a forfeiture of his salvage would inevitably follow. But I do suppose that, in many instances, the salvors did break open boxes, and took out the goods, and stowed them in bulk in their boats, with a view to their own convenience, and the promotion of their own supposed interests, and in disregard of the rights of the owners, and of the express injunctions contained in their wrecking licenses. Now, this was wrong, and I wish it to be understood by the wreckers on this coast that the law will not justify them in breaking open the boxes or packages they may save or pick up, except upon the most urgent necessity; and that the fact that their vessels are not large enough to carry the box or bale does not present such a case of necessity, when there are other vessels at hand, which may be employed for that purpose; and that they are bound by their relation to the property to take some pains to preserve its marks. Besides the inconvenience to the owners which the loss of such marks occasions, there is an additional reason why boxes and packages should not be broken open by the salvors without urgent necessity; and that is, it affords an opportunity to the covetous and avaricious among themselves, and among persons on shore, to embezzle or steal portions of the goods saved, and they are not at liberty, either upon principles of law or morals, to tempt either themselves or others unnecessarily to commit so grave a crime. Believing that the misconduct of the salvors is to be attributed more to ignorance than design, and as no complaint is made against them by the respondent's proctor, I feel at liberty, in the present case, to pass by their conduct with the remarks made, without inflicting upon them any other penalty or forfeiture.

Touching the duties of the marshal, it is to be observed that he had in hands, in this case, from the beginning, an attachment or warrant of arrest, commanding him to attach, seize, and take into his custody the cargo and materials of the ship, "and to keep the same until the further order of the court." It was his duty to have obeyed this mandate literally. He had also a mandate to sell the damaged and perishable portions of the cargo. Under these orders, it was his duty to take, forthwith, the exclusive possession of these goods, to sell those that were

perishable, and to store the residue in some safe place, secured by lock and key, kept by himself. In selling the goods, it was his duty to take the marks, and where they were obliterated to take an inventory, to have kept the account sales of the goods saved by different sets of salvors separate, so as to facilitate a settlement of the salvage, and to have arranged the goods for sale. In short, the whole matter, from the beginning to the end, was committed to him by the authority of law, and neither the salvors nor the master, nor his consignee, nor any other person, had any right to interfere with him in the performance of his duties. His was the responsibility and accountability. If, in the performance of these duties, the services of a clerk or of laborers became necessary, he had authority to employ them, and their reasonable pay would have been allowed him as disbursements in the cause. The principles of law are too well settled to need authority for their support, but the cases of Burke v. Trevitt [Case No. 2,163] and The Phebe [Id. 11,066] may be referred to. The remarks are not made with the view of censuring the marshal as to the manner he has performed his duties in the present case. I can well see that they were difficult and onerous, and no court has a more competent and efficient marshal. But they are made with an intent to indicate, for his future government, more fully than has heretofore been done by the court, what are his privileges, duties, and responsibilities.

It is therefore ordered, adjudged, and decreed that the libellants and petitioners have and recover, in full compensation for their services, fifty per cent. upon the net value of the property saved, or such a per cent. upon the gross value as will be equal to fifty per cent. upon the net value, and that the net value be ascertained by deducting from the gross value the costs and expenses of this suit, the wharfage, storage, and all other charges, to be ascertained and allowed by the court, and that all other questions be reserved.